## McQuesney *versus* Hiester.

A ground-rent reserved by deed is not within any statute of limitations, nor is it subject to a legal presumption of extinguishment from mere lapse of time.

St. Mary's Church v. Miles, 1 *Wh.* 229, affirmed.

But the arrears of a ground-rent are presumed to be paid, after the lapse of twenty years, unless there exist repelling circumstances which raise a counter-presumption.

The existence of such repelling circumstances is a question of fact for the jury, if insisted on by the plaintiff; but if the defendant himself prove such facts as repel the presumption of payment, he cannot require the court to submit them to the jury, having himself removed the legal presumption arising from mere lapse of time.

It is sufficient to rebut the presumption of payment arising from the lapse of time, that the parties under whom the defendant claimed title, entered into a written agreement with other lot-owners, to pay no more ground-rent under the plaintiff's title, and that they would mutually assist each other in resisting "to the utmost extent of law and equity;" and that the parties had resisted, with violence, the collection of the ground-rents.

Under the Act 25th April 1850, an action of covenant for ground-rent will lie against the assignee of the lessee, for arrears which accrued before the assignment.

Whether interest be recoverable on arrears of ground-rent, is a question depending on the equity of the particular case. It is recoverable, whenever payment has been unjustly withheld.

An assignee of the lessee ought not to be charged with interest on arrears which accrued prior to the conveyance to him; but on subsequent arrears, he is liable for interest.

In an action for arrears of ground-rent, the record of a former replevin issued on a distress for a portion of the same arrears, and which was abandoned by the ground landlord, is not evidence for the defendant.

ERROR to the Common Pleas of *Lancaster county*.

This was an action of covenant by Jonathan D. Hiester against William McQuesney, for twenty-eight years' arrears of a ground-rent of ten shillings per annum, on a lot in the borough of Manheim, reserved by a deed from William Bausman and others, to John Myers, dated the 28th October 1796.

The ground-rent deed contained the usual clauses of distress

[McQuesney *v.* Hiester.]

and of re-entry; and the plaintiff showed title to the ground-rent under the parties to whom it was reserved. The defendant derived title to the lot charged with the ground-rent, in 1847, under the grantee in the deed.

The defendant proved that on the 26th October 1825, the owners of lots in the borough of Manheim, including the then owner of the lot in question, entered into an agreement in writing to pay no more ground-rent to the owners of the plaintiff's title, and mutually to assist each other in resisting the collection thereof, to the utmost extent of law and equity. They denied the title of the plaintiff and his predecessors; resolved to contest the same at law; and appointed agents to conduct their defence, with authority to employ counsel, and take all other legal means to make their resistance effectual. And in 1828, when the plaintiff visited the borough, with an officer, for the purpose of collecting his ground-rent, he was resisted with violence, and drummed out of the town. There was no proof that any ground-rent had been paid since that time.

The defendant offered to prove that the plaintiff, in 1827, made distresses, which were promptly replevied by the lot-holders, and subsequently abandoned by the proprietor. The court below rejected this evidence, and sealed a bill of exceptions.

The defendant's counsel then presented the following points in writing, upon which they requested the court to charge the jury:

1. The defendant, and those under whom he claims, having held adverse possession of the property described in the *narr.* for more than twenty-one years before action brought, the plaintiff's claim is barred by the statute of limitations.

2. The plaintiff's right, (if he ever had any) having been denied and resisted nearly thirty years ago, and not having been asserted or demanded for a period of more than twenty consecutive years before action brought, is presumed in law to have been extinguished.

To these points, the court below (LONG, P. J.) returned the following answer:—"If the facts of the case are as set forth in the points Nos. 1 and 2 of defendant, and are satisfactorily proven to you, still it will not prevent the plaintiff from recovering in this case; it could only affect the amount which he should recover. When the owner of a lot subject to ground-rent resists the payment of the same, or the grantor or his assignees omit to collect the same, and the grantee or he who holds under him, holds adverse to the grantee or his assignees, such neglect or acts as are described in the first and second points of the defendant, propounded to the court for their answer, will not, as I said before, extinguish the right of the plaintiff to recover. It appears to me, that the plaintiff's right to recover does not depend upon the question whether the defendant held adversely the lot of ground out of which the ground-rent issues, for twenty-one years before action

[McQuesney *v.* Hiester.]

brought, or resists payment for thirty years; because the claim by the plaintiff is founded upon a reservation in a deed given for this lot, and the title of the defendant to the same lot resting upon this deed, and therefore, as was observed by Judge KENNEDY, in the case of St. Mary's Church *v.* Miles, 1 *Wharton* 235—' It is of the essence of the estate here, that it should continue to exist according to the original limitation contained in the reservation creating it, and accordingly it must endure for ever, unless destroyed or put an end to by some positive act of the party having the power to do so, or by an act or operation of law.' A law is now in force, but which does not apply to this case, because it only took effect so far as this case is concerned since suit has been brought, which provides that if ground-rent is not claimed for twenty-one years, it extinguishes the same."

3. If the jury believe the evidence, the arrears of ground-rent which accrued more than twenty years before suit brought, are in law presumed to have been paid, and this presumption is not repelled by any evidence in the case.

Answer.—"If there was nothing in evidence in this case to repel the presumption of payment, then there could be no recovery for a longer period than twenty years; but the facts given in evidence, to my mind, go to repel that presumption, for the evidence establishes the fact, that the plaintiff was not only resisted, but an agreement entered into by a number of citizens of Manheim, not to pay until the plaintiff's legal right was established; the facts disclosed by the testimony, I think, satisfactorily explain and show that the rent claimed was not paid."

4. If the plaintiff in this action can recover at all, he can only recover the annual instalments of ground-rent which accrued during the time the defendant owned or possessed the property described in the *narr.*

Answer.—"Since this point has been presented to the court, the plaintiff has made a proposition that if a verdict should be rendered in favour of the plaintiff, that judgment should be entered *de terris*, the effect of which would be to confine the collection of the amount of the verdict out of the land charged with this ground-rent; with this proposition, I am of the opinion, that the plaintiff is entitled to a verdict for the amount claimed. If this verdict would bind him personally, I might give different instructions."

5. Interest cannot be recovered upon arrears of ground-rent.

Answer.—"If judgment is to be entered *de terris*, which is the agreement of the plaintiff, it being upon that agreement that my answer to the fourth point is given, then I instruct you that the plaintiff cannot recover interest; but in order that this opinion may hereafter be reconsidered by this court, if they deem it necessary, I direct you to find the amount due the plaintiff with-

[McQuesney *v.* Hiester.]

out interest; but if the court should hereafter be of the opinion that the plaintiff is entitled to interest, then the interest to be added by the court, notwithstanding the verdict."

To this charge the defendant excepted; and the jury found a verdict for the plaintiff for $63.80, but if the court should be of opinion that the plaintiff was entitled to interest, then they found also for the amount of such interest. The court below, subsequently, entered judgment for the plaintiff for $121.22, and delivered the following opinion on the reserved point:—

"In Pancoast's Appeal, 8 *W. & S.* 381, interest was allowed on ground-rent created by deed, with the usual covenants, and clauses of distress, re-entry, &c.; and the arrears of ground-rent, and interest, was decreed to be paid out of the proceeds of the sheriff's sale, arising from real estate, which was sold subject to such ground-rent. According to the authority of this case, the plaintiff is entitled to interest. There are other cases which seem to militate against this decision, but as we are not aware that it has been overruled, and as it is the general rule to allow interest, in actions of covenant on ground-rent deeds, we therefore direct judgment to be entered for the arrears and interest. See also Reed *v.* Reed, 1 *W. & S.* 239; Brown *v.* Johnson, 4 *Rawle* 147; Buck *v.* Fisher, 4 *Wh.* 516."

To this opinion the defendant excepted; and having sued out this writ, he here assigned for error: 1. The rejection of the evidence offered on the trial. 2. The answers to his points. 3. The entry of judgment for interest, on the reserved point.

*Ellmaker* and *J. E. Hiester*, for the plaintiff in error, cited St. Mary's Church *v.* Miles, 1 *Wh.* 229; Act 27th April 1855, § 7, *Brightly's Purd.* 1131; *Price on Limitations* 266; Cope *v.* Humphreys, 14 *S. & R.* 15; Sellers *v.* Holman, 8 *Harris* 321; Henderson *v.* Lewis, 9 *S. & R.* 379; Foulk *v.* Brown, 2 *Watts* 209; Treackle *v.* Coke, 1 *Vern.* 165; Berry *v.* McMullen, 17 *S. & R.* 84; Weidner *v.* Foster, 2 *Penn. R.* 23; Wickersham *v.* Irwin, 2 *Harris* 108; Hannen *v.* Ewalt, 6 *Id.* 9; Quain's Appeal, 10 *Id.* 510; Louer *v.* Hummel, 9 *Id.* 450; Bantleon *v.* Smith, 2 *Binn.* 146; Ter Hoven *v.* Kerns, 2 *Barr* 97.

*Stevens* and *E. Reilly*, for the defendant in error, cited St. Mary's Church *v.* Miles, 1 *Wh.* 229; Taggart *v.* McGinn, 2 *Harris* 155; Crawford *v.* Willing, 4 *Dall.* 289; Brown *v.* Campbell, 1 *S. & R.* 176; Obermyer *v.* Nichols, 6 *Binn.* 159, 162; Buck *v.* Fisher, 4 *Wh.* 516; Naglee *v.* Ingersoll, 7 *Barr* 185; Pancoast's Appeal, 8 *W. & S.* 381; Addams *v.* Heffernan, 9 *Watts* 530; Van Rensselaer *v.* Jones, 2 *Barb. S. C.* 644; Lush *v.* Druse, 4 *Wend.* 313; Van Rensselaer's Executors *v.* Jewett, 5 *Denio* 135.

[McQuesney v. Hiester.]

The opinion of the court was delivered by

WOODWARD, J.—On the 28th day of October 1796, William Bausman, John Bausman, and Gabriel Hiester, with their wives, conveyed to John Myers in fee, two lots in the town of Manheim, in Lancaster county, reserving to themselves, their heirs and assigns, thereout, an annual ground-rent of ten shillings sterling for each lot. On the 4th January 1858, this action of covenant was brought on the reservation of the deed, for the purpose of recovering twenty-eight years of ground-rent due on one of said lots, of which the defendant, McQuesney, became the owner in 1847.

The plaintiff is the regular successor in the title of the ground-rent.

The only questions to be reviewed here are those which arose under the points submitted by the defendant in the court below. As to the 1st and 2d of these points, it is frankly admitted by counsel that the case of St. Mary's Church v. Miles, 1 Wh. 229, is an authority against them; but they ask us to reconsider the reasons on which that adjudication rests.

That a ground-rent reserved by deed is not within any of our statutes of limitations, nor subject to a legal presumption of extinguishment from mere lapse of time, are propositions so distinctly asserted and so satisfactorily maintained in the opinion of Judge KENNEDY in that case, that we do not feel called upon to go over the ground again. It has been followed in other cases, and questioned in none, and lest we weaken the argument, we leave it where it stands.

The defendant's 3d point suggests a doctrine that is unquestionably sound. Every debt, no matter how solemn the instrument which creates or evidences it, is presumed to be paid after twenty years. Lapse of time raises a legal presumption which the court applies; but the repelling circumstances may beget a counter-presumption which it is the business of the jury to apply. The law says an old unasserted claim is paid; but, if you have facts and circumstances which in their nature are reasonably calculated to persuade a jury that it is not paid, you may go to them on that question. And this rule is as applicable to arrears of a ground-rent, as to a judgment, or mortgage, or any other form of indebtedness.

The defendant complains that the court did not give him the benefit of a verdict on this principle. He is not the party to complain. He stood on the legal presumption, and the court refused to apply that. Had they given him the benefit of the legal presumption, the *plaintiff* might have insisted that the repelling circumstances should go to the jury.

The only question, therefore, is, whether the court were in error in denying to the defendant the presumption of payment from

lapse of time, and to judge of that, a few other facts must be brought into view.

One of the parties under whom McQuesney claimed the lot was Jacob Koch, and while he was owner, to wit, on the 26th day of October 1825, he, with several other lot-owners, entered into a written agreement that they would pay no ground-rent under this title, and that they would mutually assist and defend each other in resisting "to the utmost extent of law and equity." The defendant gave in evidence this league. The plaintiff showed that it was faithfully observed, for in 1828 or 1829, when he went to collect his rents, he was resisted with violence and set upon by a mob under the command of a captain, who was armed with pistol and sword. Mr. Hiester prosecuted and imprisoned some of the insurgents, and came back next year, but collected no rents. The proof was that nothing was paid after 1829.

Now, under these circumstances, the court were right in saying no legal presumption arose. The great lapse of time was accounted for. When a debtor shows that he has conspired with others to resist his creditor, and that when the creditor came for his dues he was repelled by force, and at the peril of his life, the debtor has accounted for the creditor's delay so satisfactorily, that the law will not presume the debt paid.

The defendant's complaint that his case was not committed to the jury, involves a confusion of ideas. Where a question like this arises, it is always the plaintiff, and not the defendant, who seeks the aid of the jury. The defendant stands on a presumption of law, with which the jury have nothing to do; the plaintiff on a presumption of fact, of which they are the sole judges. Yet, in this instance, the complaint, that the court dealt with the legal presumption, comes from the defendant and not the plaintiff. Inasmuch as, upon the defendant's own showing, the legal presumption invoked did not arise, his complaint is groundless.

The 4th point, or 3d assignment of error, is answered by the 83d section of the Act of 25th April 1850, *Purd.* 412, which gives the action of covenant for ground-rent against the assignees of lessees, whether the premises be held by deed poll or otherwise. The "full and complete remedy" which this section was intended to confer on ground-rent landlords, requires that the present tenant, though his title accrued in 1847, should account for the arrears of ground-rent even before he became the owner.

Whether his privity of estate, which, under the last point, affected him with the acts of Koch, would, without this Act of Assembly, make him liable for arrears antecedent to his acquisition of title, need not be considered.

The next question is, whether the defendant is liable for interest. In Bantleon *v.* Smith, 2 *Binn.* 146, it was held, that where a ground-rent landlord takes his arrears out of the proceeds of a

[McQuesney *v.* Hiester.]

sheriff's sale of the premises, he shall not have interest. The deed creating the rent in that case contained a clause of distress, and for want of sufficient distress a right to enter and hold the land, *until the arrearages should be fully paid.* C. J. TILGHMAN attached some importance to these words, and said, " we do not say how the case would be, if the deed gave him power to enter and hold as of his former estate; for in that case, his former estate in fee being revested in law, the defendant would be driven to equity for relief, and in equity it might be thought reasonable to relieve on terms of paying interest."

In Obermyer *v.* Nichols, 6 *Binn.* 161, the same learned judge treated interest upon rent as a question for equity upon all the circumstances of the case. It was allowed there, but that was not a ground-rent.

In Buck *v.* Fisher, 4 *Wh.* 526, the point that interest was recoverable in an action of covenant for ground-rent, seems to have been ruled by the District Court of Philadelphia, but was not touched in the Supreme Court.

In the case in hand, the deed contains a clause both of distress and of forfeiture, so that the landlord might have entered for want of sufficient distress and repossessed himself of his former estate. The defendant would then have been driven into equity to recover the land, and there would be required to do equity. That he would be compelled to pay up the arrears of rent cannot be doubted; but a chancellor would look at all the circumstances of the case before imposing interest. And it seems to me, that under the circumstances of this case, he would scarcely hold a purchaser of 1847 bound to pay interest from 1830. True, he took the estate with knowledge of the ground-rent that encumbered it. The Act of 1850 made him liable for arrears, but without the means of knowing whether they had been paid or not, why should he be chargeable with interest for not paying them? Interest has sometimes been called a penalty for non-payment according to contract—it is always compensation for delay in paying moneys that are *known to be payable.* But a tenant coming in, as this defendant did in 1847, and seeing the ample remedy which the landlord possessed for enforcing payment of his rent, may have reasonably presumed that no arrears were unpaid. To visit him with a penalty for not doing what he may not have known remained undone, or to require compensation from him for withholding moneys not demanded of him nor known to be payable, would not seem to be equitable.

From the time he became the owner, however, he knew the ground-rent was not paid; for, having taken the estate *cum onere,* he was the party to pay, and having withheld it he ought to make the customary compensation. If he stood in a court of equity, seeking to avert a forfeiture of his estate, he would be required

[McQuesney *v.* Hiester.]

to pay all that was due to the landlord; and in ascertaining this, I think equity would charge him interest on the arrears only from the time he acquired the estate.

If the landlord were seeking the money out of the estate, as in Bantleon *v.* Smith, 2 *Binn.* 146, Ter Hoven *v.* Kerns, 2 *Barr* 97, Sands *v.* Smith, 3 *W. & S.* 9, or Pancoast's Appeal, 8 *W. & S.* 381, I apprehend he would not be entitled to interest. But this action, though on a covenant which ran with the land, is a personal action. We are told, that something was said in the court below about a judgment *de terris*, but the judgment was not so entered. It is not a proceeding in *rem*, but in *personam;* and whilst the defendant is liable for all arrears of rent, he is made so, as to those prior to his estate, by a sheer rule of law that ought not to be carried so far as to include interest.*

We see no error in rejecting the record of the replevin. It was in our apprehension an irrelevant offer.

> The judgment, as entered upon the reserved point, is reversed; and judgment is entered for plaintiff for the arrears of rent and interest from 10th May 1847, the amount thereof to be ascertained under the direction of the court below.

* In November 1836, the case of Newman *v.* Keffer, and four other cases at the suit of the same plaintiff, were tried together in the Circuit Court of the United States, at Philadelphia, before Justices BALDWIN and HOPKINSON, and a special jury.

They were actions brought by the surviving trustee of the ground-rents, belonging to the Hamilton family, issuing out of lots in the city of Lancaster, to recover the rents of many lots, held by each of the defendants respectively. On each of these lots, the annual rent was a certain number of shillings, sterling money, of Great Britain. These rents were all in arrear for many years. By the terms of the deeds reserving them, they were made payable at Lancaster annually, for ever, in shillings sterling, or their value in coin current according to the rate of exchange between Pennsylvania and London, on the day on which the rent in each year fell due. The rents varied in amount from seven shillings to ninety shillings sterling per annum. The deeds reserving them were of various dates, the earliest having been made in 1740, and the latest in 1815. The plaintiff claimed the rent for each year, at the current rate of exchange, with interest from the day on which it became payable.

In two of the cases, the first and last, defence to a part of the plaintiff's demand was taken upon special grounds, particularly noticed below in the charge of the court. Except upon these grounds, the defendant's counsel did not contend that they were not liable to pay the principal of the rents in arrear, at the par of exchange. They insisted, however, that the rents having been, in former settlements of arrears, computed upon the footing of an estimate of the pound sterling as equal to only $4.44, they were not now liable, by reason of any difference in the rates of exchange proved at the trial, to pay on the footing of any higher estimate. They also insisted, that no interest could be recovered on the arrears of rent, or that, if any were recoverable, it was not recoverable for any time previous to the commencement of these suits in February or March 1836.

[McQuesney *v.* Hiester.]

At par, without interest, the arrears of rent due, amounted in the five cases, together, to                                                      $2862.74
To which the plaintiff claimed to add,
 Difference of exchange,                                                  218.15
 Interest,                                                              1508.27
                                                                     _____
Making the plaintiff's demand in the five suits, amount to            $4604.44

In the year 1818, the legal title to all the ground-rents in Lancaster (including the rents in question) had been vested in James Lyle, since deceased, and the plaintiff, in trust, to recover and receive the rents as they should become due, and sell or otherwise dispose of the whole or any part of them, and hold the proceeds in trust for the parties who had the beneficial ownership of the rents, according to their respective interests, expressed in the deed of trust. It appeared that, in the first eight or nine years of the existence of this trust, the practice had been for the acting trustee to send an agent to Lancaster, once or twice, or oftener, in each year, for the purpose of receiving the ground-rents. This agent generally remained there for some weeks. Concerning a power of attorney under which he acted, there arose a question which is noticed in the charge of the court. During the remaining period of the existence of the trust, from 1827 to the present day, the surviving trustee always had a resident agent in Lancaster, authorized by letter of attorney to receive the rents.

 *Cadwalader*, for the plaintiff.

 *Kittera* and *Read*, for the defendants.

 On the 30th November 1836, the following charge was delivered to the jury by—

 BALDWIN, J.—The plaintiff sues to recover rent in arrear, alleged to be due to him in virtue of the covenants contained in the deeds, by which the defendants hold, or have held, certain lots in the town of Lancaster, and adjacent out-lots. It is admitted, that the title under which he claims the rents is good, and that he has a right to receive what is due: it is also admitted by all the defendants, except the representatives of Mr. Hopkins, that they are liable for such arrears as have become due on the lots occupied by them, respectively, leaving no subject of controversy except the amount actually due. Mr. Keffer claims a credit for the rent due on one of the lots held by him, because the plaintiff had distrained his goods therefor, previously to bringing this suit. In our opinion, this is no ground for allowing such credit. The law gives the plaintiff cumulative remedies for the recovery of his rent, a distress, an action of covenant, a right of re-entry, and an action of ejectment, each of which he may pursue till he obtains satisfaction. In these respects, the remedies of a landlord are on the same footing as in the case of a mortgage and bond, the maker and endorser of a note, or several promises or obligations for the same debt: where all parties liable are sued, and all remedies against them are pursued, the pendency of one does not suspend the proceedings on, or against another. If costs have been vexatiously incurred, the law acts in relation to them as the justice of each case may require; but they cannot deprive a plaintiff of his right to recover, in an action properly brought, whatever is justly due on the contract sued on, though there may be another proceeding depending, in which he claims the same thing. We therefore instruct you as matter of law, that this credit cannot be allowed.

 It is objected on behalf of Mr. Hopkins's administrators, that they are liable only for the rent which became due during his lifetime, because the covenants in the deed by which he held the lots is not an express one, the obligation of which does not devolve on his personal representatives. We think this objection will not avail them, and instruct you that by the legal operation of

[McQuesney *v.* Hiester.]

the deeds, Mr. Hopkins was personally bound, and his administrators now liable.

As these questions affect but a small amount of the sum claimed, we have not examined them as thoroughly as we otherwise should have done; they will be considered open to future argument, should the counsel desire it. If we should be in error, it can be corrected by entering a *remittitur* for the amount of the rent due by Mr. Keffer, which has been distrained for, and what has accrued on Mr. Hopkins's lots since his death.

As to the off-set claimed on behalf of Mr. Hopkins, for his professional services to the plaintiff, or the Hamilton estate, the law is now well settled, though it was once questioned; he is entitled by law to recover such compensation for his services as they were worth, though no agreement may have been had on the subject. You will ascertain from the evidence what services Mr. Hopkins had rendered, as well as what would be a fair and reasonable compensation; it seems that he received $100, which Mr. Reigart thinks an ample sum for any services which may have been rendered in the cases referred to in the account presented by the administrators. On this subject you will do what you think is justice, and credit such sum as you may think Mr. Hopkins was entitled to for services actually performed, without deducting anything therefrom, on account of his afterwards declining his professional connection with the Hamilton estate.

A professional gentleman has also a right to claim a proper compensation, on being retained or required not to act or advise professionally, adversely to the person so retaining him, or he may be retained to act generally in all cases and matters in which the other is interested. From the letter of Mr. Hopkins to General Cadwalader, the retaining was of the latter description, and a positive engagement as the counsel of the Hamilton estate; and if you are satisfied that Mr. Hopkins declined acting as counsel of the estates, for no other reason than that stated by Mr. Reigart, and in consequence thereof that other counsel have been employed, no credit ought to be allowed on account of such engagement, beyond what will compensate Mr. Hopkins for his actual services. This is a question of fact, which is submitted to you to decide what services were performed, what is a reasonable compensation, and whether it has been received.

Before we bring to your attention the interesting grounds of controversy between the parties, we will notice some matters which have been the subject of remark in the course of the argument. Complaint has been made that the plaintiffs have resorted to this court for a remedy, instead of the courts of the state, but the right so to do has not and cannot be questioned. The reasons why he has done so, are no part of the merits of the causes on trial, or a proper subject of your or our inquiry; for whether plaintiff's reasons for suing here are good or bad, is for him and his counsel alone to judge. It is well known, that by the laws of this state, a plaintiff must sue and have his cause tried in the county where the defendant is found; the venue or place of trial can be changed only by a special Act of Assembly. In this case, the plaintiff may have been unwilling to try his causes before a local jury sitting in Lancaster, where there may be some excitement prevailing, on account of the general interest which is felt in the questions at issue between the parties. Suffice it to say, that the Constitution of the United States and the Judiciary Act give to the citizens of other states, the option of suing in this or a state court, on causes of action exceeding in amount five hundred dollars; the reasons for constituting a tribunal of a national character to decide controversies between citizens of different states, and our own citizens and foreigners, have ever been deemed wise and just, and impose on juries and courts the duty of so exercising our respective functions, as not to disappoint the just expectations of the plaintiff, or give to the defendant any just cause to regret that he has been brought within our jurisdiction. We must administer the jurisprudence of the state in this court, as it bears on the rights of the parties, and decide between them precisely as the courts of the state ought;

[McQuesney v. Hiester.]

in these causes no question arises on the constitution, laws, or treaties of the United States. We are, therefore, bound by the thirty-fourth section of the Judiciary Act, to make the laws of the state the rule of our decision, so far as they apply, and to take the settled decisions of the Supreme Court of the state, on the construction of state laws, as a part of the laws themselves. Our decision ought to be the same, which in our opinion the learned and much respected judge who presides in the court at Lancaster, would make on the causes now before us, without turning to cases referred to by counsel, not connected or having any bearing on the merits of those now on trial. Reference has been made to some part of the opinion of Judge HAYES, in Franciscus v. Reigart, in relation to the facts in evidence in that cause, but though we cannot doubt the entire correctness of the judge's review of that evidence, it cannot be noticed as tending to prove any fact which has the least bearing in these cases. Adjudged cases in books of reports are referred to for the questions of law which have been decided, but are not to be taken as any evidence to the jury of the facts therein stated.

We now come to the matters in issue between the parties, which arise on the deeds under which they hold the property on which the rents claimed have accrued; as all the deeds are similar in substance, if not in words, the one from James Hamilton, the elder, to Mary Dougherty, dated in 1740, is especially referred to.

It is an indenture, which the law deems to be the act of both parties, speaking in the words of the indenture, which is to be taken and held most strongly against the grantor as to the estate conveyed, and most strongly against the grantee as to the rent to be paid, so as to give the parties respectively the mutual benefits intended. It is a grant of a certain lot in fee, for and in consideration of the rents and services therein reserved, to be paid and performed by Mary Dougherty, her heirs and assigns; each party has an estate in fee, the grantor in the lot, the grantee in the rent; the rights of the parties depend on the deeds without any incidents of tenure which can affect the contract as a grant, with no other reservation than what is expressed on its face, which are rents and services. The rents are seven shillings sterling, &c., annually; the services are the erection by the grantee, at her cost, of a substantial dwelling-house of sixteen feet square, &c. The residue of the deed refers to the remedies of the grantor to enforce the payment of the rent, and the erection of the house. On the house being finished, the lot became discharged from all services, with no other charge or encumbrance upon it, except the payment of the rent, which is the only benefit that can accrue to or be received by the grantor, as the consideration or equivalent, in the nature of purchase-money, for the estate granted.

It does not appear that the Hamilton estate was under any rents or services to the proprietary, nor is it alleged that the title by which it was granted was made subject to any reservations; no question, therefore, can arise as to the tenure by which the site of Lancaster was held, at the time of and before the present grant. James Hamilton, the unencumbered owner in fee, granted this lot subject to specified rents and services; the grantee performed the service for his own benefit as to engagement, but for the benefit of the grantor, merely as a security or pledge for the payment of the rent which was concomitant with the estate, so long as it continued. These kinds of grants have been common from a very early period after the first settlement of the province. The rents reserved upon them in proprietary grants, have been called quit-rents; in other grants, ground-rents, as terms of common use, and rents charge, fee farm-rents, or rents service, as defined in the books of the law. But by whatever name they may be called, their nature depends on the deeds reserving them, which define the remedy for their payment, and the case in which the estate granted reverts.

Whether these rents were reserved by the proprietaries of the province, or those who held under them, they were considered as an estate in the land granted, which was subject to taxation as other property, from which even

[McQuesney *v.* Hiester.]

the proprietary was not exempt before the revolution. After the state had taken to its own use the whole estate of the Penn family, except their manors and other private property, for the consideration of £130,000 sterling, to be paid to the proprietaries, they were charged with £7000, currency, for the arrears of taxes due on their quit-rents, on lands granted by them before 1779, when their title had become vested in the state: 3 *Dall. L.* 475. The taxes due the state were exacted, though the rents were not paid, and continued to be assessed on their manor quit-rents, as a part of their private estate, as had been done before the revolution: vide Act of 1755, *Miller's L.* 53; Act of 1757, *Id.* 73; Act of 1758, *Id.* 92. "All ground-rents" were made liable to taxation by the Acts of 1779, as well as the proprietaries' proper estate: 1 *Dall. L.* 807. By the Act of 1782, "houses, lots of ground, and ground-rents" are made taxable: 2 *Dall.* 8. So by the Act of 1795, "the amount of the ground-rent, on account of the said houses, lands, and lots of ground respectively, or either or any of them, reserved, charged, and payable:" 2 *Dall. L.* 746. So, by the Act of 1799: 4 *Dall.* 511.

By the Act of 1705, for the collection of the proprietary quit-rents, the persons who hold under them by deeds reserving a quit-rent, are called freeholders: *Miller's L.* 31–2–3. So that it must be considered that the estate of the grantor in the rent reserved, and of the grantee in the land granted in fee, partakes of the attributes of other real estate, and has been so held for all purposes from the earliest time: 2 *Yeates* 24; 2 *Watts* 26. The rent was the purchase-money charged upon the land for ever. When due, it was a debt which was recoverable by the grantor, his heirs or assigns, as any other debt, it was for a sum certain in sterling money or wheat, payable or deliverable at a certain time and place, and could be apportioned on alienation: *Id.* 32–3.

With this explanation of the nature of ground or quit rents, we will now proceed to ascertain what is the rent reserved in the grant to Mary Dougherty —the words reserving it, are these:—

"Yielding and paying therefor and thereout unto the said James Hamilton, his heirs and assigns, at the said town of Lancaster, on the first day of May, yearly, for ever hereafter, the sum of seven shillings, sterling money of Great Britain, or the value thereof in coin current, according as the exchange shall then be between the said province of Pennsylvania and the city of London."

The first question which has been raised on this clause of the deed is, as to the payment of exchanges on the amount of the rent, which you observe is seven *shillings sterling*, and is all that can be required; but it must be paid in shillings sterling of Great Britain, that is, in current coin of that kingdom, which is worth seven shillings sterling there, unless the alternative pointed out in the deed is complied with, "or the value thereof in coin current," &c. This is the equivalent or substitute for the seven shillings sterling, which means, as much of the coin made current by law when the rent becomes due, as, according to the rate of exchange between Pennsylvania and London, will be equal in value to seven shillings sterling in London. As an example, if payment is made in Spanish milled dollars, which is a coin current in Pennsylvania, at 4s. 6d. sterling, but in London are worth only 4s. 2d. sterling, as bullion, there; 4d. sterling must be added to each dollar to make the 4s. 6d. in London; on the other hand, if the dollar is worth 4s. 10d. in London, it must be taken at that here.

By the agreement of the parties the rent is payable in shillings sterling, or their value in other coin, which is a legal tender for debts in Pennsylvania (which is the legal meaning of current coin, 10 *Peters* 620), according to its value as regulated by the rate of exchange. This is what the deed defines as the equivalent for the stipulated rent. It is in effect the same as rent reserved of so many bushels of wheat, or its value, in any particular place; if the wheat is delivered at the time and place stipulated, the rent is extinguished; if not so delivered there, then so much money must be paid, as will be equal to the value of the wheat at the place agreed on. In this deed, the

[McQuesney v. Hiester.]

parties agreed, that the standard of the value of the coin current in the province, should be its worth in London in sterling currency—so that the quantum of rent should be the same as if paid in shillings sterling in Lancaster, or as much coin current as would purchase the same number of shillings in London. Such is the express contract of the parties, which is not prohibited by any law of the state or of the United States, and nothing has been given in evidence, from which you can legally infer that the terms of the deed have been varied by the parties, or which will prevent the plaintiff from recovering either the amount in shillings sterling or the agreed equivalent. Though the persons who have been entitled to the rent, have been willing to receive it in current coin at the par of exchange, when it is paid on the day or on demand, that cannot bar them from claiming according to the terms of the deed, when they are put to the vexation and expense of a course of litigation to recover it.

From the state of the currency in Pennsylvania, stipulations of this kind were necessary; Acts of Assembly for "appointing the rate of the money or coin in the province, in 1700, and for the better ascertaining the rates of money in payments made upon contracts according to the former regulations," in 1705, were repealed in council: *Miller's L.* 9, 44, 45. Also, one passed in 1709, "for ascertaining the rates of money for payment of debts," &c.: *Id.* 51. The reason for the repeal was, that by the 6 Anne, ch. 30, 4 *Ruff.* 324, the value of foreign coin was directed to be of an uniform value in all the colonies, which value was fixed by that statute: *Hall and Sellers' Addendum*, p. 2. In consequence whereof it became the common practice of reserving rents payable in sterling money, or so many bushels of wheat. The latter appears to have been reserved even on grants of city lots: 2 *Dall. L.* 397. No mode therefore remained, of ascertaining the value of a shilling sterling by law as the rent became due, until it was done by Act of Congress, which would have been the rule for computing it in contracts, if a different one had not been made; it is now a rule, where sums of money are estimated in pounds sterling, on contracts to be performed within the United States, but it is otherwise, when the debt is payable in England.

In the Philadelphia Library Company v. Ingham, we find a rent reserved in 1747, of £21 sterling, as it passes in the kingdom of England on the 1st of March, in every year, for seven years; and afterwards for one hundred years for the rent of £25 sterling money, as it shall pass in the kingdom of England on the 1st of March yearly; yet, no objection was made to the validity of such a reservation of rent accruing after Congress had regulated the value of the pound sterling, in dollars: 1 *Wharton* 74, &c. Though the distress was made only for the £25 sterling at its par value here, there could be no good reason why the parties could not as well stipulate for the payment of rent according to the value of the currency in England, as in English currency; or, when they have so stipulated, why one part of the stipulation should not be as obligatory as the other. You will therefore consider the rent reserved by this deed as seven shillings sterling, or as much coin made current, and a legal tender by the acts of Congress, as is equal in value to seven shillings sterling in London, on the days it became due.

. The next question is, whether the plaintiff is entitled to interest on the arrears of rent, which must depend on the law of the state. The sum due is certain, if paid in shillings sterling, and is capable of being ascertained to a certainty, if paid in coin current by law; it is due by a covenant, and is payable at a particular time and place; it is also in effect the purchase-money of the lots, the only consideration which can be received, or in any event accrue to the grantor or his heirs. For the right of re-entry, and holding the lots as of his former estate, in case the rent is not paid, however binding at law, is in equity considered only as a penalty, from which the grantee would be relieved on paying the arrears with interest, &c., unless his conduct had been such as to give him no standing in a court of equity, which would be only in a very strong and clear case for the grantor. On

[McQuesney *v.* Hiester.]

principle then, the case of ground-rents comes within the rules long since settled by the Supreme Court of the state, that money due by bond, covenant, and bill, bears interest from the time of payment; so of the purchase-money of land, where the purchaser is in possession, and the money is due by the terms of the contract; so where there is an open account between parties, and the money has become due by their agreement, or according to a settled usage-applicable to such accounts: 6 *Binney* 162; 12 *S. & R.* 398; 17 *S. & R.* 391; 2 *Watts* 201.

Why should a debt for rent be an exception to a rule so general and just? As a matter of policy, landlords can afford to be indulgent, when they can recover interest on their rents; but, if their indulgence is a forfeiture of interest, they will be compelled to distrain, re-enter, bring ejectments, or sue on the covenant. When the landlord is made safe, and put on the same footing as other creditors, poor men can not only procure houses to live in, but purchase real estate, on payment of interest on the purchase-money, having a perpetual credit for the principal, while they are punctual in paying the rent and interest. You have seen, that the effect of exempting so much of the tenant's property from distress, for rent, as not to leave sufficient as a security to the landlord, has been the passage of an Act of Assembly in 1825, compelling tenants to give security for the rent in certain cases, or surrender possession of the property. Sound policy, and humanity to tenants, therefore, would require, that interest should be recoverable on rents, if no law forbids it; it is the only way to avoid the expense and vexation of distress and replevin, ejectment, and bill in equity, actions of debt and covenant, the costs of which fall on the tenant, while the litigation diminishes the value of the rent to the landlord, and punctual tenants find it their interest to become litigious.

If a discrimination is made between interest on rents by leases for years, and ground-rents reserved on deeds in fee, it ought to be in favour of the latter, for the land does not revert; whereas the land comes back to the landlord after the end of the lease, and he derives all the benefit of its rise in value; besides, the ground-rent is the purchase-money of the fee simple, but the rent for a time is only the estimated value of the annual use of the land.

Another and still stronger reason in favour of the ground landlord, arises from the laws subjecting ground-rents to taxation, as a distinct estate in the land; while rents arising from leases for years, are not assessed separately from the land itself, and ground-rents are assessed according to their value as reserved in the deeds. Whether the grantee pays them or not, the grantor is obliged to pay his annual quota on the whole rent reserved. If a vendor of land for a sum in gross, was compelled to pay a tax on the annual interest falling due, it would be deemed a great hardship on him, if the law would not permit him to recover the interest from the purchaser; so if the money was payable by instalments, and a tax was assessed upon them.

It has been urged in argument, that the quit-rents of the proprietaries did not bear interest, and that ground-rents therefore do not; but no such principle is to be found in any Act of Assembly, or decision of the Supreme Court of the state. That it was not the practice of the proprietaries to demand interest, may be very true; but it has nowhere been held, that there were no cases in which they could not recover it; on the contrary, we find, that whenever the court alludes to this practice of the proprietaries, an exception is made, that when there has been unreasonable or vexatious delay in paying the rent, the least compensation is interest: 2 *Yeates* 73; 4 *Yeates* 265; 6 *Binney* 162. By an Act of Assembly passed in 1705, for the more easy and effectual collecting of the proprietary quit-rents, on notice given by the receiver, the freeholders and others were obliged to pay their rents at a certain time and place; in case of neglect, the receiver was authorized to distrain, and if no distress could be found, to sue for and recover the rent by action of debt, as any other debt could be recovered by law. Where the

[McQuesney *v.* Hiester.]

quit-rents were due by non-residents, a special remedy was provided for their recovery, by suit in the county in which the land lay, judgment, execution, and sale, in the same manner as other lands may be sold on execution: *Miller's L.* 31, 33 ; *Hall and Sellers' L.* 41, 43. It would seem to be the fair and obvious construction of the law, that when rent is directed to be recovered as other debts, by suit and sale of the land on which it is reserved, interest was recoverable by the same rule which applies to other debts. Another law was passed on the same subject in 1739, which was approved in council: *Hall and Sellers* 192, 193 : and so far from proprietaries' quit-rents ever being put on a footing less favourable than other ground-rents, they were especially excepted from assessment for the road tax, by the Act of 1772: 1 *Dall. L.* 624. In 1760, a committee of the privy council recommended a repeal of an Act of Assembly, unless, among other things, it was so altered and amended, " That the payment by the tenants to the proprietaries of their rents shall be according to the terms of their respective grants, as if the act had never passed ;" which was agreed to by Dr. Franklin and Mr. Charles, the agents of the province, who pledged the Assembly thereto: *Hall and Sellers* 278. By the Act of 1779, for vesting the estates of the proprietaries in the Commonwealth, the right, title, and estates of purchasers under them are confirmed according to the grants and conveyances thereof, Section 7 ; and " the private estate of the proprietaries, their manors, together with the quit or other rents and arrearages of rents reserved thereon, are confirmed, ratified, and established for ever," " as in and by the reservations, grants, and conveyances thereof, are directed and appointed :" Section 8, 1 *Dall. L.* 824. It must then be considered as a settled principle, that even proprietary ground-rents were recoverable, according to the terms of the deeds of reservation, as other debts, and with the incident of a liquidated debt; interest as a compensation for the delay of payment. But even admitting that interest is not recoverable on proprietary quit-rents, we have the declaration of the late Chief Justice, that the inference that other ground-rents did not bear interest, had been made " without sufficient consideration :" 6 *Binney* 162: and of Judge YEATES that " we are no longer in trammels on the score of proprietary quit-rents" (*Id.* 166), since their abolition by the Act of 1779, except those due on grants of their private estate, or parts of their manors, which still remain on the same footing as other ground-rents.

In Obermyer *v.* Nichols, the Supreme Court held that interest was payable on rent, on the same principle as on other liquidated demands, and was recoverable in an action of covenant, as matter of law, unless under special circumstances. As to ground-rents, they recognised the principle, that when there was a clause of re-entry, interest ought to be paid, because equity would relieve only on payment of the rent and interest, and consider them as on the same ground as other rents. Purchase-money, from the time it becomes due, bears interest, though no demand is made: 6 *Binney* 435 ; 5 *Rawle* 262–3 ; so an action of covenant lies for a ground-rent, as soon as it is due, without a demand: 3 *Penn. R.* 464–5. On a recognisance in the Orphans' Court, for securing to a widow the interest on her third part of the money at which an estate is valued, the Act of 1794 makes it recoverable as rent; the Supreme Court hold the widow's interest to be in the character of annuity, of interest on money, and a rent-charge, and that if the interest be not punctually paid, the widow shall recover interest on the interest, from the time it became due: 2 *Watts* 203. There cannot be a stronger case; for as a widow's annuity partakes of the character of a rent-charge, a rent-charge partakes of the character of the annuity, and it is so considered by the court, who put it on the same footing as to bearing interest. The reason is the same in both cases; the annuity is in the nature of maintenance income, and bears interest if not paid punctually, because it is in lieu of the widow's share of the profits of the land, and all that is reserved to the widow; the rule is the same as to ground-rent, as it is of the same nature. But a court never inquires into the fact,

[McQuesney *v.* Hiester.]

whether the annuity or the rent is necessary for the support of the widow or the ground landlord; the rule is the same whether they are rich or poor, being founded in the nature of the debt, and the manifest justice of interest being paid as a compensation for withholding payment: 2 *Watts* 203. On these principles which have been established by the Supreme Court, we give it to you as our decided opinion, that interest is recoverable on ground-rents as a part of the contract of grant, unless in cases where there are such circumstances as make an exception to the general rule. If it is an ordinary case, interest is payable as a matter of law. Circumstances which make exceptions are matters of fact. Courts do not direct interest to be allowed in the name of interest, but leave it to the jury to find it or not, where there is no usage to pay it, no time fixed for payment of the principal, no account rendered, or demand of payment made: 12 *S. & R.* 398. But where there is an usage, the time fixed, or demand made, the jury are directed to find it: 17 *S. & R.* 391. Thus, the jury were so directed, in case of the widow's interest, on the Orphans' Court recognisance: 2 *Watts* 201; on the other hand, where an annuity was given to a widow, charged on land in lieu of her dower, and she had made no demand for several years, the court left it to the jury to allow interest, or not, on the arrears, as they should think that she had lived on the land or not: 17 *S. & R.* 390.

When the landlord resorts to the land for payment of rent, he shall not recover interest: 2 *Binney* 153–4; 17 *S. & R.* 391. When his conduct has been unfair, oppressive in exacting too much rent, when he has given reason to believe that he did not want his rent, and the tenant has been willing to do justice by paying what is due, the jury have a discretion to find interest or not: 6 *Binney* 162; 17 *S. & R.* 391. But a demand of the rent on the premises puts the matter beyond a doubt, that interest must be paid; the mere not distraining is no evidence of an intention to relinquish the interest; and if the tenant knows that the landlord wants his money, and does not pay what is justly due, he is not excused from paying interest.

This is the law of the state which you will apply to the evidence. It is not necessary for the plaintiff to prove a demand on the day the rent is due, or a specific demand of each year's rent; it is sufficient that he, or his agent, attends at a convenient time and place, in Lancaster, and gives notice of his readiness to receive the rents; where the rents of the whole city are payable on the same day, to the same person, a reasonable demand or notice is all that is required. If you believe the witnesses, this has been sufficiently proved, in point of law, to come within the established rules of the Supreme Court; in point of fact, you will decide whether there has been such reasonable demand or notice, as the nature of the case requires. There is clear evidence on this subject, and the defendants have offered nothing to rebut or contradict it. If you find such demand or notice, the law is clear, that if the rent is not then paid, the plaintiff has a right to recover interest from the time the rent became due, as a matter of contract and law; unless you shall find that there are some special circumstances, which make these cases an exception to the general rule. What these circumstances are, is for you to decide, as matter of fact. Their sufficiency in law to make out an exception is for the court to decide; for instance, Ch. J. Tilghman declares, that the mere not distraining for rent when it is due, is no evidence that the landlord intended to relinquish interest, and that a demand of payment on the premises, would put the matter beyond a doubt; there would, in such cases, be no fact to decide; so, if the tenant knows the landlord wants his money, and is guilty of unreasonable or vexatious delay, the law compels him to pay interest.

On the other hand, if the landlord has acted unfairly or oppressively, by demanding too much, or otherwise, while the tenant has been willing to do justice by paying what is really due, in such cases, the question of interest is in the discretion of the jury; so if the landlord has given good reason for

[McQuesney v. Hiester.]

believing he did not mean to exact interest, provided the tenant was willing to pay the rent when demanded or wanted. But the practice of the landlord or his agent, not to demand exchange or interest from punctual tenants, is not such a circumstance as to authorize a jury to apply it to those who have had no inclination to pay, but have put the landlord to the delay, vexation, and expense of litigation, and who have suffered arrears to accumulate, till the interest nearly equals the principal. When interest and exchange are demanded by suit, from a tenant who offers to pay his rent at par, on notice, it will be the time to decide what law and justice require; no such case, however, is now before us; none of the defendants have shown an offer or willingness to pay anything; the evidence is full to the contrary. As an illustration of the effect of applying the same rule to punctual and delinquent litigant tenants, take the cases of Mr. Ross and Mr. Keffer, who occupy parts of the same lot. Mr. Ross has paid his rent punctually, Mr. Keffer has paid none for years; if he is not to pay interest, he will be largely the gainer by the delay and litigation. If the case is otherwise clear, such an effect ought to be avoided as a bad example in society.

In referring to the grounds of defence taken in the argument, we find little if anything which contradicts the justice of the plaintiff's claim to all he demands. It has been objected, that the power of attorney from Mr. Lyle to Mr. Ellis was defective, because he did not sign it as trustee, though he signed it as administrator *and otherwise;* but it is a well settled rule of law, that if a man has competent power to do an act, and misrecite his power, the act is valid notwithstanding. The act will be referred to the authority which will make it legal and operative. It is also objected, that Mr. Lyle was a joint trustee with Mr. Newman, and could not appoint an agent alone; the law is otherwise: one joint tenant, trustee, or executor, may receive the whole rent, or appoint a bailiff to collect it. In this case, too, there is sufficient evidence to prove the assent of Mr. Newman to the agency of Mr. Ellis, and an authority by parol is sufficient.

Unless, therefore, you shall find that there are such circumstances in these cases, or any of them, as come within the exceptions to the general rules in relation to interest, it is due to the plaintiff as matter of law; he is also entitled to recover the exchange by the plain and express terms of the contract, the obligation of which cannot be impaired. In conclusion, we will remark, that when the rights of a landlord are clear, their enforcement according to the settled principles of law, will insure comfort and protection to the tenant.

In each case, the jury found a verdict in favour of the plaintiff. The verdicts, together, amounted to \$4604.44, the full sum claimed by the plaintiff, including difference of exchange and interest.

The defendants' counsel afterwards moved for a new trial and in arrest of judgment. On the 13th December 1836, these motions were overruled, without argument, and judgment was entered for the plaintiff on the verdicts.