# CHARLES TOWN.

McClellan v. Town of Weston.

Decided September 7, 1901.

1.  Town Corporation—*Persons Must Take Notice.*
    Sections 8 and 9 of an Act of the General Assembly of Virginia passed January 14, 1846, incorporating the town of Weston, are as follows: "8. *Be it further enacted,* That all streets, cross streets and alleys, which are already laid off and opened, or which may at any time be located, surveyed and opened in

said town, shall be and they are hereby established as public streets and alleys of the said town. 9. That the said trustees shall, within six months after the passage of this act, open all the public streets and alleys of said town; shall make or cause to be made a survey and correct plan or plat of said town, showing distinctly each lot, street and alley, and the size and width thereof, numbering anew all lots, and showing the former as well as the new numbers of all lots which have been numbered heretofore, with such remarks and explanations thereon as they may deem necessary and proper; which plan or plat so made out, and under the hands and seals of any four of said trustees, shall be lodged in the clerk's office of the county court of Lewis County, there to be recorded and kept; and the said plan and survey so duly made, signed, sealed and recorded, shall, in all future suits and contests concerning the boundaries of the lots, streets and alleys of the said town, be deemed, held and taken as full and conclusive evidence between the parties: *Provided*, that infants *femes covert*, persons *non compos mentis*, or out of the commonwealth, shall have six months after such disability shall be removed; within which time they may contest such plan and survey so made and recorded." *Held*: That all real estate owners in the town were bound to take notice of said Act incorporating said town as well as of the acts of the trustees required by said Act to be performed thereunder, in reference to the plan and survey of said town so to be made, signed, sealed and recorded. (p. 672).

2.   MUNICIPAL CORPORATION—*Survey Recorded.*

Such plan and survey when duly recorded was full and complete notice to all abutting real estate owners on the streets and alleys of said town of the claims of the town as to the location of the lines of such streets and alleys. (p. 672).

3.   PUBLIC STREETS—*Acquire no Title.*

Persons in possession of any portion or portions of such streets and alleys so laid out by having the same enclosed and so continued in possession after the making and recording of such plan and survey held such possession subject to the demands of the town whenever it should see proper to open such streets or alleys to their full width for the public use. (p. 676).

Appeal from Circuit Court, Lewis County.

Bill by Floride McClellan and others against the town of Weston. Decree for complainants, and defendant appeals.

*Reversed.*

E. A. BRANNON, for appellant.

W. W. BRANNON, for appellees.

McWhorter, Judge:

On the 18th day of October, 1818, Daniel Stringer and wife conveyed by deed of that date to Lewis Maxwell "The following lots or parcels of ground situate, lying and being in the town of Preston. * * * * Lot as named in the ground plan of said town Nos. 1 and 2, adjoining each other, and bounded as followeth (to-wit) on the north side by lot No. 3, on the south side by First street, on the east end by Centre street for one hundred and forty-five feet and on the west end by an alley, each containing seventy-two, one-half feet in breadth and one hundred and fifty feet in length. By deed of date 23d December, 1836, Lewis Maxwell conveyed to John Lorentz the said lot No. 1, described in said deed as "situate in the town of Weston, it being lot No. 1, on the west side of Centre street on which said Lorentz's shop now stands, seventy-two and one-half feet in front and one hundred and fifty feet in length. By deed dated 20th November, 1844, John Lorentz and wife conveyed to Rankin W. Douglass the same lot No. 1 described as situate in the town of Weston on the west side of Centre street, it being lot No. 1, and bounded on the southwest by First street, on the west by an alley, on the north by lot No. 2, on the front by Centre street, being seventy-two and one-half feet in front and one hundred and fifty feet back, containing one-fourth of an acre." By deed dated 16th day of November, 1846, Douglass and his wife conveyed said lot No. 1 by same description to William E. Arnold. Said William E. Arnold by his last will and testament devised said lot to Susan M. Arnold, his wife, for life, remainder in fee to his daughter, Floride McClellan. The General Assembly of Virginia by an act passed January 14, 1846, incorporated the town of Weston, by which name it had been called for several years before its incorporation, but had theretofore at one time been known as Preston and at another as Flesherville. Section 8 of said act provided, "That all streets, cross streets and alleys which are already laid off and opened, or which may at any time be located, surveyed and opened in said town, shall be and they are hereby established as public streets and alleys of the said town." And section 9 provided that the trustees for whose election it was provided in said act should "within six months after the passage of this act, open all the public streets and alleys of said town; shall make or cause to be made a survey and correct plan

of all said town, showing distinctly each lot, street and alley, and the size and width thereof, numbering anew all lots, and showing the former as well as the new numbers of all lots which have been numbered heretofore, with such remarks and explanations thereon as they may deem necessary and proper; which plan or plat so made out, and under the hands and seals of any four of said trustees, shall be lodged in the clerk's office of the county court of Lewis County, there to be recorded and kept; and the said plan and survey so duly made, signed, sealed and recorded, shall, in all future suits and contests concerning the boundaries of the lots, streets and alleys of the said town, be deemed, held and taken as full and conclusive evidence between the parties: *Provided,* That infants, *femes covert,* persons *non compos mentis,* or out of the commonwealth, shall have six months after such disability be removed; within which time they may contest such plan and survey so made and recorded." Under said section the trustees of said town of Weston proceeded to make such survey and map, and on the 8th day of June, 1847, lodged the same in the clerk's office of the county court of Lewis County, and caused the same to be duly recorded therein. On the first day of June, 1899, the council of the town of Weston passed an order to open up the streets to the full width according to the said plan and map. The said life tenant of lot No. 1, Susan M. Arnold (since deceased) and the remainderman Floride McClellan enjoined the town authorities from opening said Centre street through said lot by removing therefrom such obstructions as had been placed thereon, claiming that the lot is enclosed just as it was at the time and before it came into the possession of William E. Arnold in November, 1846, and that it had been so held as against the town and everybody adversely all these years, and cannot be now disturbed in that possession relying for protection in their adverse possession on the case of *Campbell* v. *City of Wheeling,* 12 W. Va. 36; *Teass* v. *St. Albans,* 38 W. Va. 1, and other cases cited. The defendant, the town of Weston, filed its demurrer and answer. Depositions were taken, the cause submitted, and the circuit court perpetuated the injunction. The defendant appealed from said decree, assigning as error the perpetuation of the injunction, because in doing so the circuit court totally and wholly ignored and disregarded the decision of this Court in the case of *Ralston* v. *Weston,* 46 W. Va. 544, (33 S. E.

326), and the later case of *Weston* v. *Ralston*, 36 S. E. 446, and in effect followed the case of the *City of Wheeling* v. *Campbell*, 12 W. Va. 36, which this Court overruled and repudiated in said case of *Ralston* v. *Weston*. Counsel for appellee in a very elaborate and very able brief reargues the case of *Ralston* v. *Weston*, *supra*, to satisfy the Court that its decision in that case was wrong, and should be overruled in deciding the case at bar, and thus return to what he terms the safe and sound position held in *Wheeling* v. *Campbell*, 12 W. Va. In the case of *Ralston* v. *Weston*, followed by that of *Weston* v. *Ralston*, especially in the concurring opinion of Judge Brannon in the latter, the questions involved in the case at bar are so thoroughly considered and discussed that very little new light can be thrown upon them. Prior to October, in the year 1818, a "general plan" of the town of Weston (then called Preston) had been adopted, and the lot No. 1 in controversy was conveyed with reference to that general plan as mentioned in the deed from Daniel Stringer and wife to Lewis Maxwell, the lot was described as fronting on Centre street. The streets and alleys as per that plan had been dedicated to the public and lots sold with reference thereto. When the dedication took place does not appear. There is no plat produced showing any "general plan" prior to that of 1847. The act of the General Assembly of January 14, 1846, incorporating the Town of Weston, adopted the general plan of the said town already theretofore accepted and acquiesced in by all the parties interested. Section 9 of said act providing that the trustees should "within six months after the passage of the act, open all the public streets and alleys of said town," and should make or cause to be made a survey and correct plan or plat of said town showing distinctly each lot, street and alley, and the size and width thereof, numbering anew all lots and showing the former as well as the new numbers of all lots which had been theretofore numbered. In the performance of their duties the trustees followed the general plan of the town, fixing the lines, giving the courses and bearings, the width of the streets and alleys and size of the lots, and in numbering the lots the lot in question was given the same number it had in the description given it in the said deed of October, 1818, and subsequent deeds. The deeds all show a uniform size of the lots, seventy-two and one-half by one hundred and fifty feet, whether fronting on Centre street or Main street. The plat prepared by, or for, the trustees, ap-

proved by them under their hands and seals, was duly recorded as provided by said act on the 8th day of June, 1847. This record was notice to all parties interested of the claims of the town under it. All persons interested were bound to take notice of the public act of assembly incorporating the town as well as of the acts of the trustees required by the act to be performed thereunder in the preparation and recordation of the plan and survey of said town as dedicated by the original plan. Appellee claims that although her possession may encroach upon the streets and alley as laid out and recorded by the trustees, such possession is adverse to the claims of the town, and has ripened into a perfect title. By fair implication at least, by the said act of incorporation, it was clearly made the duty of William E. Arnold or any other property owner whose interests were affected by the survey and plat to take the initiative and contest the plan and survey so recorded, within six months after such recordation of said plat. Section 9 of the act of January 14, 1846, provides that such "plan and survey so duly made, signed, sealed and recorded shall in all future suits and contests concerning the boundaries of the lots, streets and alleys of the said town, be deemed, held and taken as full and conclusive evidence between the parties," and at the close of said section, there is a saving proviso to those under disability as follows: "*Provided,* that infants, *femes covert* and persons *non compos mentis* or out of the commonwealth shall have six months after such disability shall be removed: within which time they may contest such plan and survey so made and recorded." This provision is intended to place those property owners who might be affected by the said survey and who were at the time of its recordation under any of the disabilities mentioned, on an equal footing with those who were not so under disability. William E. Arnold, the owner of said lot No. 1, and in possession thereof with full knowledge of the said plan of the town as laid out on the said plat, and of the claims of said town thereunder, took no steps to contest the correctness thereof, but acquiesced therein and continued to hold such portions of the streets according to such plan and plat as he had enclosed subject to the demands of the town whenever it should see proper to open such streets to their full width. There is nothing in evidence to show that Arnold or the plaintiff ever held otherwise than subject to the rights of the town. No notice was ever given the town or authorities thereof that it was

proposed to hold the possession adversely, or hostile to the rights of the town. So that if the statute of limitations applied, it could not in the face of the act of incorporation begin to run before notice to the town of such adverse and hostile possession. *Hudson* v. *Putney,* 14 W. Va. 561; *Industrial Co.* v. *Schultz,* 43 W. Va. 470; *Creekmer* v. *Creekmer,* 75 Va. 430; Hutch. Land Titles, s. 408; and *Ralston* v. *Weston,* 46 W. Va. 544, where it is well said that "No possession of a portion of a street not required by the present necessities of the public could raise the presumption of such notice; for the reason that there is nothing inconsistent with a public easement for the authorities to allow an abutting land owner the temporary occupation of a public highway not demanded for the present use of the public." The appellee relies very strongly on the case of *Ralston* v. *Miller,* 3 Rand. 44, where it is held that "Ancient reputation and possession, in respect to the boundaries of streets, are entitled to infinitely more respect in deciding upon the boundaries of the lots, than any experimental survey that can now be made. If not, the whole city, and all other towns, would be thrown into the utmost confusion." This was a contest between private parties where the purchaser enjoined the collection of the purchase money of a lot purchased by him, not a corner, but an "inside lot," fronting on a street, claiming that the building which bounded his lot on one side, and was on the corner of the street, encroached upon the street about two feet. There was no claim by the city that there was any encroachment, and no threat that possession would be disturbed, and the question of the location of the street was not involved. As between the parties the wall of the building was sufficient to mark the line. *Yates* v. *Town of Warrenton,* 84 Va. 337, was a case very similar to case at bar. In 1811 trustees laid off the town, among others locating a certain street twenty-three feet wide. In March, 1887, the council of the town determined to open the street according to the plan adopted by the trustees seventy-six years before. The sergeant of the town under the order of the council entered and began to tear away the fence of Yates to open the street according to said plan, when Yates enjoined the town from further proceedings. The survey directed by the court showed that plaintiff had all the land called for by his deed and included within his enclosure twenty-three inches of said street, and Yates proved that he had had long adverse use of said strip of land. It was held, 1. "There

was a dedication and acceptance of the streets as located by the trustees." "2. The possessor can acquire no right nor title to any part of such highway by adverse possession thereof for any length of time whatever." And further that, "Any unauthorized obstruction of such highway is an indictable nuisance. And when a municipality has control of its streets, it may proceed in its corporate name to prevent or remove obstructions therein by judicial proceedings." And in *Taylor* v. *Commonwealth,* 29 Grat. 780, (syl. pt. 7), "The streets of the city of Manchester having been dedicated to the public by Wm. Byrd, when he laid off the town, and this dedication having been accepted by the act of the House of Burgesses in November, 1769, the streets are public highways; and any occupation of a street, or a part of a street, by the owner of an adjoining lot, *however long* continued, cannot give such occupant a right to hold it, or bar the right of the public to the use of the street to its full width and extent." And in the case of the *City of Norfolk* v. *Chamberlain, Id.* 534, where the city council had granted permission to C. in replacing a bank building, which had been destroyed by fire, to extend the steps of the building on the pavement so they should not extend beyond the distance occupied by the steps of the building which had been destroyed, and afterwards on petition of other nearby property owners, the council directed the steps removed as a nuisance, C. enjoined their removal. On appeal it was held that inasmuch as the original permission to place the steps of the building on the public street was beyond the powers of the municipal authorities, they were not estopped to order their removal. See also *Bunton* v. *Danville,* 93 Va. 200. In the later Virginia cases, involving questions between municipal authorities and private individuals touching the rights of the public in the streets, the case most confidently relied upon by the appellee, that of *Ralston* v. *Miller,* seems not to have been invoked as authority sustaining the position held by appellee, and it was not in any instance in such cases referred to by the court as sustaining such position. In *Commonwealth* v. *McDonald,* 16 Ser. & R. 395, Justice Duncan says that "public rights cannot be destroyed by long continued encroachment," and in *Barter* v. *Commonwealth,* 3 Penn. & W. 253, Gibson, C. J., said "That the government of any incorporated town has a right to improve the streets for public purposes, is a proposition about which there

can be little disptue," and "No private occupancy, for whatever time and whether adverse or by permission can vest a title inconsistent with it." *Rung* v. *Shoneberger*, 2 Watts 23 ; *Cincinnati* v. *Lessee of White*, 6 Pet. 431. Any continuous obstruction of a public highway or street, not authorized by competent legal authority is a public nuisance. *Davis* v. *New York*, 14 N. Y. 506. Section 660, 2 Dill. Mun. Cor. (4th Ed.) "The King cannot license the erection or commission of a nuisance ; nor in this country can a municipal corporation do so by virtue of any implied or general powers. A building, or other structure of a like nature, erected upon a street without the sanction of the legislature, is a nuisance, and the local corporate authorities of a place cannot give a valid permission thus to occupy streets without express powers to this end conferred upon them by charter or statute. The usual power to regulate and control streets has even been held not to authorize the municipal authorities to allow them to be encroached upon by the adjoining owner, by erections made for his exclusive use and advantage, such as porches extending into the streets, or flights of stairs leading from the ground to the upper stories of buildings standing in the line of the streets," and cases there cited. In *Pettis* v. *Johnson*, 56 Ind. 139, where the owners of a building leased the same to the city, the condition was that they were to construct an iron stairway on the outside of the building, occupying for that purpose five feet of the adjoining alley, and by the contract the city granted to said parties a perpetual right to maintain such stairway ; the stairway was held a public nuisance, and that the city had no power to contract for such a structure in such a place. The common council of a city can only contract by ordinance, resolution or order, and an illegal and void contract cannot form the ground work of an estoppel. *Scheider* v. *Hutchinson*, 35 Oregon 253, reported in 76 Am. St. Rep. 474, in "reference to stenographic notes," on "Adverse possession of public property," beginning on page 479 the subject is very ably and elaborately discussed. It is there said, "In defense of the doctrine that highways and other public easements may be made the subject of adverse possession, it is asserted that statutes of limitation, being statutes of repose, should be liberally construed so as to effectuate the intention of the legislature ; and that to exclude from their operation any action that a state might bring would be giving them a strict construction. The answer to this is the

elementary principle that legislatures in the enactment of statutes cannot be presumed to transcend their constitutional authority, which they would do should they attempt to abridge the sovereign rights of the people. Again, it is contended that there is no reason why a state should not be barred of its right to action to recover property as well as an individual. One has not far to look for reasons why a state in respect to its sovereign rights should not be so affected. 'Experience does not justify the presumption that the commounity at large will assert their rights with the same promptness with which individuals assert their private rights. The opposite is notoriously true. Individuals may reasonably be held to a limited period to enforce their rights against adverse occupants, because they have sufficient interest to make them vigilant. But in public rights of property each individual feels but a slight interest, and rather tolerates, even a manifest encroachment, than seeks a dispute to set it right. The state is impersonal. The people do not, and cannot, legally act in a body, their power must of necessity be exercised through agents. It cannot be expected that these agents will manifest the same diligence in detecting and resisting encroachments on public interests that individuals evince in the protection of their private rights.' *Slate* v. *Franklin Falls Co.,* 49 N. H. 240; 6 Am. Rep. 573. No man wishes to single out himself and be an actor against his neighbor. What is every man's concern is no one's, and hence it is that no time should bar the enforcement of a public right. Public easements belong to the people and cannot be aliened or otherwise disposed of except in accordance with their will. To permit individuals to acquire title therein by prescription allows them to accomplish through the want of vigilance or the indulgence of the public or through their own mistake or cupidity what they could not accomplish legitimately. The great weight of authority supports the proposition that title by adverse possession cannot be acquired in streets, highways, or other property dedicated to the use of the public;" and cites *Webb* v. *Demopolis,* 95 Ala. 116; *Reed* v. *Birmingham,* 92 Ala. 339; *Ames* v. *San Diago,* 101 Cal. 390; *Yolo* v. *Barney,* 79 Cal. 375; 12 Am. St. Rep. 152; *Visalia* v. *Jacob,* 65 Cal. 434; *Ralston* v. *Weston,* 46 W. Va. 544; *Lee* v. *Mound Station,* 118 Ill. 304; *Alten* v. *Ill. Trans'n Co.,* 12 Ill. 38; *Sullivan* v. *Tichenor,* 179 Ill. 97; *Schmidt* v. *Draper,* 137 Ind. 249;

*Cheek* v. *Aurora*, 92 Ind. 107; *Heddleston* v. *Hendricks*, 52 O.
St. 460; *Childs* v. *Nelson*, 69 Wis. 125; *Commonwealth* v. *Moore-
head*, 118 Pa. St. 344; *Rung* v *Shoneberger*, 26 Am. Dec. 95,
(2 Watts 23); *Driggs* v. *Phillips*, 103 N. Y. 77; *Asylum* v. *Troy*,
76 N. Y. 108; *Laing* v. *R. R. Co.*, 54 N. J. L. 576; *Price* v. *Plain-
field*, 40 N. J. L. 608; *State* v. *Trenton*, 36 N. J. L. 198; *Ulman*
v. *Charles. St. Ave. Co.*, 83 Md. 130; *Almy* v. *Church*, 18 R. I.
182; *Simmons* v. *Cornell*, 1 R. I. 519; *Yates* v. *Warrenton*, 84
Va. 337; *Taylor* v. *Commonwealth*, 29 Grat. 780; *Croker* v. *Col-
lins*, 37 S. C. 327; *Moose* v. *Carson*, 104 N. C. 431; *Vicksburg*
v. *Marshall*, 59 Miss. 563; *Ice Co.* v. *New Orleans*, 43 La. Ann.
217; *Shreveport* v. *Walpole*, 22 Id. 526; *Sims* v. *Chattanooga*,
2 Lea 694; *Raht* v. *Railway Co.*, (Tenn.) 50 S. W. Rep 72;
*Waterloo* v. *Mill Co.*, 72 Iowa 437; *Taraldson* v. *Lime Springs*,
92 Iowa 187; *Williams* v. *St. Louis*, 120 Mo. 403, and other
authorities.    The evidence shows pretty conclusively that the
Minnich building at the corner of First and Main streets on line
with the Tierney building and with the Bailey hotel at the corner
of Second and Main, all on the west side of Main street consti-
tutes the starting or beginning point for the survey of the town,
and fixes the west line on Main street.    It is true the plat of the
town is not produced nor found, but it is clear that the trustees
in making their survey and plat which was recorded June 8,
1847, made it to conform to the old plan, and it is evident that
in numbering the lots the trustees made no changes in the num-
bers, but adopted the old numbers which accounts for the lots
having but one number, when the act required the old numbers
as well as the new to be shown on the new plat.    As far as num-
bers mentioned in deeds made prior to the date of the plat of
1847, the old numbers are preserved in the plat and adopted.
While the starting point on Main street for a survey of the town
is well established, the corner of First and Center streets on the
south line of First is more certainly established, principally by
the evidence introduced by appellee.    Judge John Brannon testi-
fies that about the year 1849 or '50 when about to locate his
dwelling house which he now occupies he wanted to place the
front of his house parallel with the line of First street and to be
certain of the boundary of First street he made inquiries as to
the abbuttals or marks for the border of said street, that he in-
quired of Major Thomas Bland who occupied and had for years

before that occupied property on that street, and of Jacob
Butcher who had lived in or about town, and who had been a car-
penter in building the first two or three houses in the town.
Major Bland stated that the posts of the portico of his dwelling
on the front boundary on said street were on the line of it, and
Butcher told him he remembered seeing a rock placed where
there was a corner of some property, and that corner would be on
the corner of what was then a road going westward from the
court house; that they examined by digging and found a small
rock "that had apparently been set up on end." Witness then
took his compass and ran a line from that down and past where
the said pillars of the porch of said Bland stood. At that time
he was also informed there was an outside chimney to a frame
house which stood on the corner of Main and First streets; that
it was stated to him and "so reported all around that that was
built out from the building, but was on the line of said First
street;" that he measured and made some other tests and observa-
tions and found it to correspond with the other side of the street
as it then existed and was used. "By that means I got the true
line of my lot." Witness states that the rock stood digaonally
from the McClellan property across said First street and across
the road he mentioned; that while he lived close to the point
where the rock was, "the enclosures are now as they were then,
and at a point at or just about where the corner of the present
fence is. He further says that the eastern line of Center street
extended from Fourth street clear on across First street to the
stone would show it to stand at the intersection of Centre street
with First street, and that the fence of W. W. Brannon now cor-
ners in the place where the said stone was discovered. Here we
have a corner established by not only the statement of Judge
Brannon that the old man Jacob Butcher told him that he re-
membered of seeing a rock placed on the corner of some property
and that corner would be on the corner of what was then a road
going westward from the court house, but on examination by
digging the rock was found where it was stated to have been
placed, having been "washed over by deposits from First street
from rain and the like," as stated by the witness Judge Brannon.
Peter Flesher, the surveyor who made a survey of the town finds
that starting the width of First street on the south line thereof
from the Minnich or Edmiston corner on Main street and run-
ning with the line of First street to correspond with the corner

post of the iron fence of W. W. Brannon's property, which is the location of the said stone corner except as to distance in running the line of First street from the corner of Main after measuring the width of Main and Centre streets, and the alley and the length of the lots, as laid down on the map, there was three feet too much. Flesher testifies that by giving the distance three feet short of the rock corner and making that the east line of Centre street as the measurements laid down on the map of 1847 would do, the result would be that the street line would run three feet further in the lots facing on the west side of Centre street than the line run by him. He further says that he found "the old King House," which is an old land mark standing at the corner of Centre and Second streets on the east side of Centre to correspond nearly with the iron fence (or rock corner) and the corner of the Bailey house, after allowing the three feet mentioned between the Main street point and the iron fence post. It is clear that the trustees in surveying and preparing their map in 1847 established the stone corner as on the east line of Centre street and the south line of First street to accommodate as far as they might their lines of the streets and alleys to the enclosures as they were at the time of making their survey. This accounts for the three extra feet required above or beyond the width of the streets and length of the lots to reach the stone corner or the east line of Centre street from the point on Main street. As a further evidence of this it will be observed that the alley between First and Second streets running from Main to Centre called Bank Alley is given on said trustee's map a width of twenty feet, while the rest of the same alley has the regular width of all the other alleys of twelve feet. It is not at all probable that in making the original plan the owner who dedicated the streets and alleys for the use of the public would give a part of one alley a greater width than all other alleys and greater, too, than other parts of the same alley. While the trustees yielded the three feet and perhaps changed the location of Centre street to that extent they preserved the general course of the streets and alleys, the bearing of the streets running parallel with the river being then north thirty-seven east, and the cross or numbered streets being south fifty-three east. It is further shown that by the survey as made by Flesher appellee has still one hundred and fifty-three feet in the length of her lot from Centre street to the alley, three feet more than her deed calls for. In *Walsh* v. *Hopkins,*

48 Atlantic Rep. 390 (R. I.) it is held, "What is the legal line of a street must be determined by the record of the lay out, and not by the line of the street as actually used." This was a proceeding by *mandamus* to require the defendant, the inspector of buildings of the city of Providence, to issue a building permit, proposing to erect a building over what is called the "Moshassuck River" claiming they had title. The respondent in his return claiming that the title was in the city. Stines, C. J., says in the opinion of the court: "The claim of the petitioners that the line as actually used, rather than that of the record of the lay out, should be taken as the line of the street is urged upon the authority of *Aldrich* v. *Billings,* 14 R. I. 233. The two cases are very different. The question in that case was not where the legal line of the street actually ran, but what was to be taken as the line intended in a deed between private parties." Counsel for appellee in his brief referring to case of *Walsh* v. *Hopkins,* just cited, says: "It has never been claimed in the case under consideration that the true boundaries between Mrs. McClellan's lot and Centre street, First street and the alley are to be ascertained by reference to streets and alley *as actually* used" and adds, "I have always maintained and still insist, that the best evidence of the true lines are the old buildings, old enclosures and ancient possessions," which position is true as a rule, but "old buildings, old enclosures and ancient possessions" cannot stand as indicating the true line of a street, as against the well established monument set up for the true corner and line of the street in the plan and lay out of the town. The counsel then again cites *Ralston* v. *Miller,* 3 Rand 49, and claims that the case of *Walsh* v. *Hopkins,* cited, differs, from case at bar in that in the Walsh case the lay out was clear and about which there seemed to be no dispute, while in this case "the buildings were constructed, the lot enclosed and in actual occupancy many years before there was any lay out or plat. The old plat mentioned in the old deeds is not produced." It does appear from the record that the lay out under the act of assembly of 1846 is clear, the western line of Main street as well as the eastern line of Centre street are well established and the lines are run straight, giving their bearings, and the lay out shows no such irregularities in the streets and alleys as the buildings and enclosures show according to the record. It is insisted by counsel for appellee that

the proceeding by the town authorities to open the street under the ordinance of June 1, 1899, is in violation of the fourteenth amendment to the Constitution of the United States, in that it is proceeding to take private property without due process of law, the title of appellee being vested by reason of the adverse possession over which the public has the easement in question having ripened into a perfect title by virtue of the statute of limitation. In *Ralston* v. *Town of Weston,* 46 W. Va. 544, it is held, syl. 3 : "The maxim *'Nullum tempus ocurrit regi'* applies to all the sovereign rights and property of the people of the State dedicated to public uses, and of which they cannot be deprived otherwise than according to their express will and appointment." 4. "The public easement in the public highways, including roads, streets, alleys and other public thoroughfares, dedicated to the use of the general public by individuals, or under the right of eminent domain, is such property, and cannot be lost to the people by the negligence of public officials or the unlawful acts of individuals." 5. "An individual cannot destroy such easement by setting up a claim by prescription, adverse possession under the statute of limitations, or equitable estoppel, as the people cannot be deprived of their sovereign rights in any of those ways."

The lay out of the town being thoroughly established, the appellee can only claim title by adverse possession by virtue of the statute of limitations, which under the rule in the *Ralston-Weston Case* cited, does not and cannot apply in this case, and as she acquired no right by virtue of what she claims to be adverse possession, the question of due process of law cannot arise in this case. It is not a taking of private property for public uses, it is only the taking of that which belongs to the public by dedication, and of which the public cannot be deprived; such an easement as an individual cannot destroy "by setting up a claim by prescription, adverse possession, or equitable estoppel," as held in *Ralston* v. *Weston,* cited.

The decree of the circuit court will be reversed, the injunction dissolved and plaintiff's bill dismissed.

*Reversed.*